UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Mary Shawn Connolly,

    Plaintiff,

    v.                                Civil Action No. 2:09-CV-183

City of Rutland, Vermont, et al.,

    Defendants.

## <u>OPINION AND ORDER</u>
(Docs. 39, 43, 47)

Plaintiff Mary Shawn Connolly commenced this civil action against her former employer, City of Rutland, and Rutland Mayor Christopher Louras on August 7, 2009. (Doc. 1.)  Connolly alleges that she was wrongfully terminated from her employment with the Rutland Recreation and Parks Department.  (*Id.*)

Defendants have filed a Joint Motion for Summary Judgment upon all of Connolly's claims.  (Docs. 39.)  Connolly opposes the Motion (Doc. 50), and has filed a Motion for Partial Summary Judgment (Doc. 47).  For the reasons set forth below, Defendants' Joint Motion for Summary Judgment (Doc. 39) is GRANTED with respect to Connolly's claims arising under federal law; Connolly's Motion for Partial Summary Judgment (Doc. 47) is DENIED; and Connolly's claims arising under state law are DISMISSED without prejudice.

<u>**Background**</u>

**I.   Relevant Facts**

   The following facts are taken from the parties' Local Rule 56 Statements and from exhibits submitted in connection with Connolly's Motion.  (Docs. 39-2; 43-2; 47-2; 50-1; 55-1.)

   A.   The Parties

   Plaintiff Mary Shawn Connolly commenced employment with Defendant City of Rutland's Recreation and Parks Department in August 2004.  (Doc. 47-2 ¶ 1.)  At all times relevant to this lawsuit, Defendant Christopher Louras was the mayor of the City of Rutland ("the City").  (Doc. 47-2 ¶ 14.)  Connolly's full-time position title was Administrative Assistant, and she held this position until June 30, 2009.  (Doc. 47-2 ¶¶ 11, 12, 14.)  Connolly's employment with the City was not governed by any written contract or collective bargaining agreement.  (Doc. 39-2 ¶ 2.)

   B.   Connolly's Termination

   Under the Rutland City Charter, the mayor must prepare an annual budget and submit it to the City Board of Alderman on or before the first Monday in June.  (Doc. 38-2 ¶ 3); CITY OF RUTLAND MUNICIPAL CHARTER, 24 V.S.A. App. Ch. 9, § 11.3.  On June 1, 2009, Mayor Louras presented his Fiscal Year 2010 budget to the Board of Alderman, emphasizing that the City's finances would require budget cuts resulting in a negative impact on services provided to taxpayers.  Specifically, the letter introducing the mayor's budget stated:

> I remind the Board of the letter I presented in January regarding the long
> term budget challenges facing the City of Rutland.  As I stated in that letter,

we are "down to bodies" as the only significant place we can turn in order
to curtail tax increases that are driven by ever spiraling healthcare costs and
contractual obligations.

This FY2010 budget reflects thirteen fewer employees than were funded
in the FY09 budget.

(Doc. 47-16 at 2.)  The budget included a proposal for two layoffs in the Recreation and

Parks Department.  (Doc. 47-17 at 2-3.)

On June 1, 2009, Connolly received a letter from Ejay Bishop, the Recreation and

Parks Department Superintendent and Connolly's supervisor, informing her of her

"proposed layoff":

This is to advise you that as a result of the current economic climate and the
city-charter imposed tax cap, the reduction of your position of
administrative assistant has been proposed effective the close of the current
fiscal year.  This proposed decision has nothing to do with your job
performance, rather it is based on the position which we feel can be
absorbed with the minimum impact on city services.

Prior to rendering a final decision on the proposal, you are entitled to a
*Loudermill*[1] meeting with me.  The purpose of a *Loudermill* meeting is to
provide you an opportunity to offer any additional information to be
considered prior to making a final decision concerning your proposed
layoff.  The meeting is purely optional on your part.  If you do not wish to
have a *Loudermill* meeting, you may present written materials for me to
consider.  If you would like to take either of these options, please let me
know by the close of business on Friday, June 5th via the enclosed form.

(Doc. 47-20.)  Attached to the letter was a form entitled "*LOUDERMILL* MEETING

OPTION FORM."  (Doc. 47-21.)  Connolly opted to have the *Loudermill* meeting, which

was held with Bishop on June 8, 2009.  (Doc. 47-23.)  At the meeting, Connolly

---

[1] A "*Loudermill* meeting" or "*Loudermill* hearing" is a proceeding whereby a public employee is
provided with notice by her employer and an opportunity to be heard prior to her termination, consistent
with the demands of the Fourteenth Amendment to the United States Constitution.  *See Cleveland Bd. of
Ed. v. Loudermill*, 470 U.S. 532, 541-46 (1985).

presented a description of her responsibilities in the department and an explanation of why, in her opinion, her position should not be eliminated.  (Doc. 39-3 at 7.)

At Bishop's deposition, he testified that he eliminated a Maintenance Specialist position from the budget at the same time he notified Connolly of her proposed layoff. (Doc. 39-6 at 3.)  Bishop further testified that he did not know of any information Connolly could have presented at the *Loudermill* meeting that would have changed his mind about terminating her position.  (Doc. 50-5 at 4.)  Connolly testified in her deposition that she had no evidence that Defendants had other motivations for her termination besides their stated reason of lack of funds.  (Doc. 39-3 at 5.)

Following the *Loudermill* meeting, Connolly received another letter, dated June 12, 2009, stating in relevant part:

> [T]his is to advise you that a final decision has been made with regards to the reduction of your position of Administrative Assistant at the end of this fiscal year.  As stated earlier, this action has been taken in light of the current economic climate and city-charter imposed tax cap.  This decision has nothing to do with your job performance, rather it is based on the position which we feel can be absorbed with the minimum impact on city services.
>
> As you know, prior to rendering a final decision on the proposal, you were entitled to a *Loudermill* meeting with me which you exercised on June 8[ ]. The purpose of a *Loudermill* meeting was to provide you an opportunity to offer any additional information to be considered prior to making a final decision concerning your proposed layoff.  I listened and seriously considered the information you shared during that meeting, however I have decided to move forward with the reduction of your position of Administrative Assistant within this department effective the end of the business day on June 30, 2009.

(Doc. 47-23.)

On June 15, 2009, Connolly's attorney sent a letter to Bishop requesting a hearing before the Board of Civil Authority ("BCA"), stating:

> I have been retained by . . . Connolly regarding her employment with the City of Rutland.  Please consider this request for a hearing before the Board of Civil Authority pursuant to the Personnel Rules and Regulations manual for the City of Rutland regarding the letter Ms. Connolly received from Superintendent Ejay Bishop, dated June 12, 2009.

(Doc. 47-24.)

Bishop's response, dated June 19, 2009, explained that Connolly was not entitled to a hearing before the BCA because she had not been dismissed pursuant to the terms of the Personnel Rules:

> Ms. Connolly has not been "*demoted, dismissed or suspended*" pursuant to the Personnel Manual.  (See attached Section V – 2 of the personnel manual, which defines dismissal as a 'for cause' dismissal for "*inefficiency or incapacity, insubordination, misconduct or immoral conduct, intoxication, offenses against the law, or other similar just cause.*")  As I told Ms. Connolly in the original letter sent to her and subsequently in the meeting that you attended, this layoff has nothing to do with her job performance, but is solely related to economic and budgetary conditions.  Therefore, since this is not a 'for cause' dismissal but rather an economic layoff, she is not entitled to a hearing before the BCA in this matter.
>
> I made this decision since the personnel manual invests me with the responsibility of "administering the policies of the personnel manual" (See Section I – 3 attached).

(Doc. 47-25.)

Subsequently, on July 20, 2009, Bishop wrote a letter of recommendation for Connolly.  (Doc. 39-11 at 2.)  The letter was addressed generically to potential future employers ("To Whom it May Concern") and attested to Connolly's professionalism and her "interest and pride" in her work during her tenure with the Rutland Recreation and

Parks Department.  (*Id.*)  Bishop wrote that Connolly "was an asset to our department" and that he was "confident she will be a fine choice for your organization."  (*Id.*)

On August 4, 2009, the BCA met to "consider jurisdiction of [the] BCA in layoffs."  (Doc. 47-26.)  Present at the meeting were Connolly's attorney, several aldermen, Mayor Louras, and City Attorney Andrew Costello.  (Doc. 47-28.)  The following day, Louras, as presiding officer over the BCA, issued a statement providing that the BCA "determines that [it] has no authority to hear appeals for lay-offs under the personnel manual as written and in effect on August 4, 2009."  (Doc. 47-30.)

C.    The City's Hiring of Two Part-Time Employees

After Connolly's termination, other existing employees in her department initially took over some of her former duties.  (Doc. 50-5 at 8-9.)  Additionally, on August 3, 2009, Bishop hired Brook Townslee, a former intern, to replace a part-time employee who had recently resigned.  (Doc. 39-2 ¶ 32.)  Townslee's position, which was for twenty-five hours per week, included some of Connolly's former duties.  (Doc. 50-5 at 8-9.)  On August 24, 2009, Bishop hired Mary Markowski, who had experience as an auditor, for fifteen hours per week.  (Doc. 50-5 at 6, 9.)  Markowski also performed some of Connolly's former duties.  (Doc. 50-5 at 6.)  Neither position was posted as a vacancy.  (Doc. 50-5 at 8.)  In a set of interrogatories, Connolly asked Defendants why they "did not attempt to notify" her of any "job opening or hiring opportunity."  (Doc. 38-1 at 4.)  Defendants' joint response stated that they did not inform her because she "had already filed suit against the city."  (*Id.*)

**II.      Procedural History**

Following the BCA's determination that it had no authority to hear Connolly's appeal, Connolly commenced this suit against the City and Mayor Louras on August 7, 2009, alleging that she was wrongfully terminated from her employment. (Doc. 1.)  She initially brought claims arising under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, the Vermont Constitution, Vermont contract law, and the Vermont Fair Employment Practices Act, 21 V.S.A. § 495. (Doc. 1; Doc. 26 ¶¶ 1, 48-62.)  After Defendants conceded that they "did not attempt to notify" Connolly of any "job opening or hiring opportunity" because she "had already filed suit against the city" (Doc. 38-1 at 4), Connolly subsequently amended her Complaint to add a claim for retaliation arising under the First Amendment to the United States Constitution. (Doc. 26.)  None of Connolly's claims allege wrongful termination on the basis of some form of discrimination such as age, race, gender or political affiliation.  She contends only that the City's claim that it was forced to lay her off due to "economic and budgetary conditions" is a pretext for the Mayor's "political" motivation to present a budget that would not require voter approval. (Doc. 47-1 at 3; Doc. 47-25.)

In Defendants' Joint Motion for Summary Judgment, they argue that there are no disputed issues of material fact and that they are entitled to judgment as a matter of law upon all of Connolly's claims. (Doc. 39.)  In addition, Defendant Louras argues, alternatively, that he is entitled to summary judgment on the basis of qualified immunity or lack of personal involvement. (Doc. 43.)  Connolly opposes Defendants' motions, and moves for partial summary judgment, asserting that there are no genuine issues of

material fact with respect to her claims arising under the Fourteenth Amendment and

Vermont contract law, and that she is entitled to judgment as a matter of law upon those

claims.  (Doc. 47.)

### <u>Standard of Review</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "'if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); *see City of Burlington v.*

*Hartford Steam Boiler Inspection and Ins. Co.*, 190 F. Supp. 2d 663, 669 (D. Vt. 2002).

A fact is material when it affects the outcome of the suit under the governing law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The burden of demonstrating the absence of a genuine issue of material fact rests

upon the party seeking summary judgment.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

157 (1970).  Yet, "as to any claim, or essential element thereof, for which the nonmoving

party bears the burden of proof at trial, the nonmoving party must make a showing

sufficient to establish the existence of that claim or element."  *Billado v. Parry*, 937 F.

Supp. 337, 341 (D. Vt. 1996).  If the non-moving party fails to do so, the moving party

may obtain summary judgment by "simply point[ing] out the absence of evidence to

support the non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of*

*America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).

Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "'[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.'" *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (quoting *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)). Rather, Rule 56(c) and (e) require that a nonmoving party must set forth specific facts in affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial. *Cifarelli*, 93 F.3d at 51 (citing *Celotex*, 477 U.S. at 324).

In ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *See, e.g.*, *Anderson*, 477 U.S. at 255; *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). "Where both parties have moved for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Murray v. Int'l Bus. Machs. Corps.*, 557 F. Supp. 2d 444, 448 (D. Vt. 2008) (quotation omitted). The court's function in considering the motion for summary judgment is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *See, e.g., Anderson*, 477 U.S. at 255; *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir. 1988). Assessments of credibility, choices between conflicting versions of the events, and weighing of evidence

are matters for the jury, not for the court on summary judgment.  *Rule v. Brine, Inc.*, 85

F.3d 1002, 1011 (2d Cir. 1996).

**Discussion**

## I.       **Federal Constitutional Claims**

42 U.S.C. § 1983 "provide[s] a remedy when federal rights have been violated

through the use or misuse of a power derived from a State."  *Kletschka v. Driver*, 411

F.2d 436, 448-49 (2d Cir. 1969).  The statute states:  "Every person who, under color of

any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes

to be subjected any citizen of the United States . . . to the deprivation of any rights . . .

secured by the Constitution . . . shall be liable to the party injured in an action at

law . . . ."  42 U.S.C. § 1983.

Connolly's Section 1983 claims arise under the First and Fourteenth Amendments.

Specifically, she alleges that (1) she retained a constitutionally-protected property interest

in her employment which Defendants violated by terminating her without adequate due

process; (2) Defendants' claimed reason for terminating her ("lack of funds") was a

pretext; and (3) in retaliation for her filing of this lawsuit, Defendants failed to inform her

that part-time employment with the City was available.  (Doc. 50 at 2, 5.)  In their Joint

Motion for Summary Judgment, Defendants argue that (1) Connolly was an at-will

employee; (2) even assuming Connolly retained a protected property interest, she was

afforded constitutionally adequate due process in her termination; (3) Connolly sets forth

no evidence that she was terminated for any reason other than lack of funds; and (4)

Defendants were not required to give Connolly special notice of the availability of part-

10

time work.  (Doc. 39-1 at 6, 14.)  As explained below, the Court concludes that material

questions of fact exist with respect to whether Connolly's employment was "at will" or

whether Connolly had a reasonable expectation of continued employment giving rise to a

property interest.  However, no due process violation occurred in her termination and no

genuine issue of material fact exists with respect to the reasons Connolly was terminated.

In addition, the Court concludes that Connolly's lawsuit is not constitutionally protected

speech.  Therefore, no First Amendment violation occurred.

    A.       Fourteenth Amendment Due Process Claim

        1.       Protected Property Interest

"To succeed on a claim of procedural due process deprivation under the

Fourteenth Amendment – that is, a lack of adequate notice and a meaningful opportunity

to be heard – a plaintiff must first establish that state action deprived him of a protected

property interest."  *Spinelli v. City of New York*, 579 F.3d 160, 168-69 (2d Cir. 2009).

Property interests are not created by the Constitution, but by existing rules or

understandings that stem from independent sources, "such as state law-rules or

understandings that secure certain benefits and that support claims of entitlement to those

benefits."  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  To create a property

interest, the state-law rule or understanding must give the recipient "a legitimate claim of

entitlement to [the benefit]."  *Id.*; *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756

(2005).  A public employee has a property interest in continued employment if the

employee is guaranteed continued employment absent "just cause" for discharge.  *Moffitt

v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991).

In Vermont, employment for an indefinite period is generally considered employment at will. *Brace v. Int'l Bus. Machines Corp.*, 953 F. Supp. 561, 566 (D. Vt. 1997). *Cf. Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 5 (2002) ("[W]e are mindful . . . that at-will employment relationships have fallen into disfavor.").  "An at-will agreement is terminable at any time, for any reason or for none at all." *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 313 (1996) (quotations and brackets omitted).  At-will employment status may be modified by express agreement, statute, an employer's personnel policies or practices, or actions or communications made by the employer that reflect assurances of continued employment.  *Brace*, 953 F. Supp. at 568; *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 20 (1995); *Farnum v. Brattleboro Retreat, Inc.*, 164 Vt. 488, 494 (1995) (holding that whether employee could be discharged without cause where contents of three handbooks contained mixed messages was a question of fact for jury); *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 570-71 (1992); *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 270 (1986).

"Handbook provisions committing the employer to a progressive discipline system are sufficient for a jury to find that the employer may terminate the employee only for cause." *Trombley v. Southwestern Vt. Med. Ctr.*, 169 Vt. 386, 392 (1999); *see Taylor v. Nat'l Life Ins. Co.*, 161 Vt. 457, 464 (1993) (holding that personnel manuals that are inconsistent with an at-will relationship may be used as evidence that the employment contract requires good cause for termination).  "When the terms of a manual are ambiguous . . . or send mixed messages regarding an employee's status, the question of

whether the presumptive at-will status has been modified is properly left to the jury." *Dillon*, 175 Vt. at 6-7.

As discussed below, Connolly asserts that her employment status with the City was inconsistent with at-will employment as a result of (a) the terms of the Personnel Rules and Regulations; (b) a memorandum she received concerning disciplinary policies; and (c) disciplinary actions the City took against her in 2006.  (Doc. 47-1 at 12-17.) Defendants contend that none of these things modified Connolly's presumptive at-will status.  The Court finds that the evidence set forth below establishes that the issue is one properly left to a jury.

### a.   Personnel Rules and Regulations

The parties agree that the City's Personnel Rules and Regulations ("personnel rules") governed the terms of Connolly's employment.  (Doc. 47-6.)  The stated purpose of the personnel rules is "to establish procedures for administrative action concerning the various personnel activities and transactions" and to "indicate the customary and most reasonable method of carrying out the aims of the personnel program."  The personnel rules also "inform the employees of the City of Rutland regarding the conditions of work in the city service."  (*Id.* at 4.)

More specifically, the personnel rules define the types of appointments to city service and establish rules governing demotions, dismissals, suspensions, and reprimands, including an appeal procedure.  Under the title "Permanent Employees," the personnel rules provide:  "A permanent employee works full time and on a continuing basis (indefinite term)."  (Doc. 47-6 at 5.)  "[T]he term 'permanent,' when used in an

employment contract with reference to a term of employment normally means nothing more than indefinite employment." *Ross*, 164 Vt. at 19 (quotation omitted).  Thus, it appears, at first, that the manual has not modified the presumption that Connolly's employment was at will.

Yet, under the section governing dismissals, the personnel rules state that "[a] department head, by approval of the Board of Civil Authority, may dismiss any employee for inefficiency, or incapacity, insubordination, misconduct or immoral conduct, intoxication, offenses against the law, or other similar *just cause*." (Doc. 47-6 at 7 (emphasis added).)  This provision indicates that Connolly may have been terminable only for just cause, such that she retained a protected property interest.  Additionally, a subsection entitled "REPRIMAND" provides that "[i]n situations where an oral warning has not resulted in the expected improvement, or where more severe initial action is warranted, a written reprimand shall be sent to the employee . . . and a copy shall be placed in the employee's personnel folder."  (*Id.* at 8.)  This provision suggests that the Recreation and Parks Department applied a progressive discipline policy to employees such as Connolly.

### b.  Memorandum Concerning Disciplinary Procedures

During the course of her employment, Connolly received additional indications that she was subject to a progressive discipline policy.  A memorandum from a former Assistant City Attorney, to department heads explained "the proper procedures for taking disciplinary actions against non-union employees." (Doc. 47-2 ¶ 8.)  The memorandum provided that department heads may issue oral and written reprimands.  The

memorandum also outlined procedures for suspensions without pay, demotions, and dismissals.  The section addressing dismissal procedures stated that the employee must be given written notice of the department head's intentions to dismiss the employee.  (*Id.* at ¶ 9.)  The dismissal section further provided that the employee must receive notice that he or she may request a hearing before the department head and a hearing before the BCA. (*Id.*)

### c.  2006 Disciplinary Action Against Connolly

Connolly was disciplined in accordance with the progressive discipline policy.  In January 2006, Bishop gave Connolly a "Discipline Form," stating that Connolly's job performance had been deficient.  (Doc. 47-7.)  The form indicated that Connolly had been warned verbally on two prior occasions that her job performance needed improvement.  (*Id.* at 2.)  The form also indicated that Connolly would be placed on probation for three months, during which she would be given an opportunity to demonstrate her ability to correct the deficiencies and "prove that she can accomplish the job requirements."  (*Id.* at 3.)

In April 2006, Bishop and Connolly executed a memorandum, addressed to Connolly's personnel file, stating that "Connolly has met all the set requirements of the Disciplinary form" and that she had "proved that she can accomplish the job responsibilities during the 90-day probation," and "is now in good standing in her position of Administrative Assistant in [the] Rutland Recreation and Parks Department and is no longer on probation."  (Doc. 47-2 ¶ 11.)  Thereafter, Connolly was not disciplined further and maintained her employment until June 30, 2009.  (*Id.* at  ¶ 12.)

In sum, although no modification of Connolly's at-will status occurred by express agreement or statute, a jury could reasonably find that Defendants' personnel policies, practices, actions, and communications reflected assurances of continued employment in this case. The provisions of the personnel manual, progressive discipline evidence, and Defendants' practices establish that whether the City modified Connolly's presumptive at-will status is an issue for a jury to decide.

2.      Termination Procedure

Because a reasonable jury could conclude that Connolly had a protected property interest in her employment, the Court must now consider whether Defendants afforded Connolly constitutionally-adequate due process in terminating her. *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 541 (1985) ("[O]nce it is determined that the Due Process Clause applies, the question remains what process is due.") (quotation omitted). Connolly argues that she was denied constitutionally-adequate pre-and post-termination proceedings. (Doc. 47-1 at 17-19.) She also contends that although Defendants claimed she was terminated due to lack of funds, the true reason she was terminated was "political" because Mayor Louras wanted to be "sensitive to the taxpayer." (*Id.* at 3.) More precisely, Connolly claims that there was no "charter imposed tax cap," rather, the decision to terminate her was motivated by the mayor's reluctance to seek permission from the electorate for a property tax increase. (*Id.*) Defendants contend that a laid off employee is not entitled to any due process, or, alternatively, that Connolly was granted all the process that was due. (Doc. 39-1 at 14-17.) Defendants further assert that Connolly fails to set forth any evidence that her termination was based upon a pretext or

16

sham.  (Doc. 55 at 7-9.)  As explained below, the Court concludes that no due process

violation occurred and that Connolly fails to set forth any genuine issue of material fact

that her termination was based on a pretext or a sham.

i.       Pre-Termination

Connolly argues that her pre-termination hearing "lacked the necessary attributes

of due process."  (Doc. 47-1 at 18.)  She also contends that the decision to terminate her

had already been finalized prior to the hearing and that, as a result, the pre-termination

proceeding was not truly "pre-termination" at all.  (Doc. 47-1 at 17.)  Defendants

disagree, arguing that Connolly was not entitled to any due process given that she was

laid off due to budget cuts.  Alternatively, Defendants argue that if a pre-termination

hearing was required, the *Loudermill* meeting was constitutionally adequate.  (Doc. 39-1

at 14-17.)

"Unlike the existence of a property interest, which finds its origins in state law,

minimum procedural requirements are a matter of federal law."  *Ciambriello v. Cnty. of

Nassau*, 292 F.3d 307, 319 (2d Cir. 2002) (quotation, brackets and ellipsis omitted).

 "[T]he root requirement" of the Due Process Clause is "that an individual be given an

opportunity for a hearing before he is deprived of any significant property interest."

*Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis omitted).  "This principle

requires 'some kind of a hearing' prior to the discharge of an employee who has a

constitutionally protected property interest in his employment."  *Loudermill*, 470 U.S. at

542 (quoting *Roth*, 408 U.S. at 569-70).  The pre-termination hearing "need not be

elaborate," *Loudermill*, 470 U.S. at 545, but a public employee is "entitled to oral or

17

written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546.

In this case, Connolly was provided oral and written notice and an opportunity to be heard prior to her termination. On June 1, 2009, Connolly received a letter from Bishop stating that "the reduction of your position . . . has been proposed" effective June 30, 2009. (Doc. 47-20 at 2.) The letter informed Connolly that she was "entitled to a *Loudermill* meeting" and explained that the reason for her proposed termination was "the current economic climate" and not her job performance. (*Id.*) There were no "charges" against Connolly, and hence no "evidence" supporting any charges in the letter. Approximately one week later, Connolly met with Bishop and was given an opportunity to present reasons why her position should not be eliminated. (Doc. 47-1 at 9.) On June 12, 2009, Connolly received a second letter from Bishop, explaining that he had listened to Connolly at the *Loudermill* meeting, but that the City had decided to go forward with her layoff for economic and budget-related reasons. (Doc. 47-1 at 10.) These pre-termination proceedings clearly satisfy the standard under *Loudermill*, which simply requires oral or written notice, an explanation of the employer's evidence, and an opportunity for the employee to present her side of the story. *Loudermill*, 470 U.S. at 546.

One notable difference between the facts of this case and those at issue in *Loudermill* is that *Loudermill* involved alleged misconduct by the employee, whereas here, there were no allegations of misconduct on the part of Connolly. As a result, the *Loudermill* court's balancing of "the private interests in retaining employment, the

18

governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens" was different from the balancing of interests required here, where an employee is laid off for budget-related reasons.  *Loudermill*, 470 U.S. at 542.  Where there is no allegation of misconduct, the employee's interest necessarily weighs less significantly because there is no need for the employee "to present [her] side of the story."  *Id.* at 546.  In other words, there is nothing for the employee to refute, and, as a result, the pre-termination hearing contemplated by *Loudermill* may serve little purpose in a case like Connolly's.

Assuming a pre-termination hearing was actually required, the Court disagrees with Connolly's assertion that her June 8, 2009 pre-termination hearing was insufficient because "the decision to terminate Connolly was made finally on June 1, 2009."  (Doc. 47-1 at 17.)  The plaintiffs in *Ryan v. Illinois Department of Children and Family Services*, 185 F.3d 751, 762 (7th Cir. 1999) made an argument similar to this one, but under different factual circumstances.  The Seventh Circuit's reasoning in that case is instructive.  In denying summary judgment for the defendants on this issue, the Seventh Circuit stated:  "That at the start of the [pre-termination] hearing the agency decisionmakers tentatively believe the employee should be removed does not raise a constitutional problem . . . so long as the decisionmakers are open to other views."  *Id.*

Here, viewing the facts in the light most favorable to Connolly, the record does not support a conclusion that the decision to terminate Connolly was made prior to her *Loudermill* meeting.  The material facts surrounding Connolly's *Loudermill* meeting are not in dispute.  The initial notice Connolly received on June 1 stated that the reduction of

19

her position had been "proposed" as a result of "the current economic climate" and not her job performance.  (Doc. 47-20 at 2.)  The *Loudermill* meeting was held on June 8, and Connolly was given an opportunity to present reasons why her position should not be eliminated, and she did so.  Following the *Loudermill* meeting, Bishop's June 12 letter stated that he had "listened seriously and considered the information [Connolly] shared" in the *Loudermill* meeting but had decided to go forward with her layoff.  (Docs. 47-1 at 10; 47-23 at 2.)  The facts demonstrate that, although a decision had been made to eliminate at least one position, it was not certain that position would be Connolly's.  Instead, the record supports that Defendants were "open to other views" with respect to how to trim the budget of the Recreation and Parks Department.  *Ryan*, 185 F.3d at 762.

Contrary to Connolly's assertions, the fact that Mayor Louras may have lacked authority to restore funding to the City's budget once he submitted the budget to the Board of Alderman does not show that Defendants had already decided to terminate Connolly before her pre-termination hearing.  As Connolly states in her Motion for Summary Judgment, the budget, which was submitted before her *Loudermill* meeting, called for elimination of *a full-time employee* from the Recreation and Parks Department budget.  (Doc. 47-1 at 18.)  The budget neither specified what position might be reduced nor who the full-time employee might be.  The City's budget demanded that Bishop carefully consider the needs of his department, including the views of its employees, in deciding which position to cut, and the record shows that he did so.

20

ii.     Post-Termination

Connolly next contends that Defendants improperly denied her post-termination proceedings, and that Defendants' invocation of an economic re-organization "exception" to due process must fail because of Connolly's claim that the City's purported lack of funds is a sham.  (Doc. 47-1 at 19-20.)  Defendants disagree, asserting that no post-termination proceeding was necessary and that Connolly fails to set forth any claim that she was terminated for any reason other than budget concerns.  (Doc. 55 at 10-14.)

An employee who has a protected property interest in her employment may also be entitled to a post-termination hearing.  *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands." ); *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001) ("When . . . a . . . public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards."); *Dwyer v. Regan*, 777 F.2d 825, 834 (2d Cir. 1985) *modified*, 793 F.2d 457 (2d Cir. 1986) ("The nature of a claim of sham is such that a posttermination hearing will likely be more valuable to the claimant than a pretermination hearing.").  Indeed, *Loudermill* was premised "in part on the provisions in [the applicable state] law for a full post-termination hearing." *Salterella v. Town of Enfield*, 427 F. Supp. 2d 62, 74 (D. Conn. 2006).  In this case, Defendants gave Connolly adequate pre-termination procedure, as described above.  Connolly timely requested a post-termination hearing before the BCA, but was not afforded any kind of post-termination review.  (Doc. 47-30 at 2.)

In determining whether procedures, in general, are constitutionally sufficient, courts balance the private and governmental interests at stake, and consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1972); *Brody v. Vill. of Port Chester*, 434 F.3d 121, 135 (2d Cir. 2005). Here, the private interest affected by the City's actions was the loss of Connolly's employment. Significantly, however, Connolly was not terminated for any performance-related reason. (Doc. 47-23.) To the contrary, Bishop signed a letter of recommendation on July 20, 2009, shortly after Connolly was terminated, stating that Connolly "conducted herself professionally and . . . demonstrated an interest and pride in [her] work." (Doc. 47-32.) Bishop also wrote that Connolly was "an asset to [the Rutland Recreation and Parks] department" and that she would be "a fine choice for your organization." (*Id.*) Thus, although the loss of employment is a significant private interest, no stigma attached to Connolly's termination and there is no indication that her dismissal created impediments to future employment. These facts weigh in Defendants' favor. *See Mayfield v. Kelly*, 801 F. Supp. 795, 798 (D.D.C. 1992).

Also weighing in Defendants' favor, there was little risk of erroneous deprivation because Connolly was not terminated for performance-related reasons. Additional procedural safeguards would have added little or no value to the City's decision-making process in determining which positions to cut, and holding a post-termination hearing

22

would have served little purpose.  Finally, the City's interest in executing economic and efficiency-related personnel decisions and in managing the costs of its workforce and services is substantial.  *See Dwyer*, 777 F.2d at 833.  Requiring the City to hold post-termination hearings for each employee who is terminated due to workforce reductions would impose additional fiscal and administrative burdens on the City.

Relying on similar reasoning, other courts have explicitly recognized that when a public employee is laid off due to lack of funds without a hearing, no due process violation occurs.  *See Whalen v. Mass. Trial Ct.*, 397 F.3d 19, 25 (1st Cir. 2005) ("[W]e have recognized a limited 'reorganization exception' to due process that eliminates the need for a hearing where a reorganization or other cost-cutting measure results in the dismissal of an employee."); *Misek v. City of Chicago*, 783 F.2d 98, 100-01 (7th Cir. 1986); *Baker v. Civil Serv. Comm'n of W. Va.*, 245 S.E.2d 908, 912 (W. Va. 1978) ("Where a classified position has been abolished, the employee ordinarily is not entitled to a procedural due process hearing."); *Powell v. Jones*, 305 N.E.2d 166, 172 (Ill. 1973) ("[T]he qualitative differences between layoff and discharge are such that variances in procedure are constitutionally permissible."); *Kelly*, 801 F. Supp. at 798 ("A [reduction in force] clearly does not raise the same due process concerns that are raised by for-cause dismissals.")  As one court has explained, this "economic reorganization" exception "follows from the *Loudermill* decision itself."  *Kelly*, 801 F. Supp. at 798.  In *Kelly*, the court reasoned:

> In evaluating whether the employer's actions violated due process the *Loudermill* court balanced "the private interests in retaining employment,

> the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens."
> . . . .
> These interests weigh differently in a [reduction in force] than they do in a removal for cause.  The employee's interest in a for-cause dismissal involves more than the position at stake because of the stigma that results from a for-cause dismissal and the problems such dismissal might create for future employment opportunities.  Although a [reduction in force] results in significant hardship for the terminated employees, it does not pose these additional problems.

*Id.* (quoting *Loudermill*, 470 U.S. at 542-43).

Under the economic reorganization principle, Connolly was not entitled to post-termination due process.  The City's stated reason for terminating Connolly arose out of economic concerns, including the "current economic climate and the city-charter imposed tax cap."  (Doc. 47-20.)  Bishop's letters to Connolly in connection with her termination stated consistently that the decision to lay off Connolly had "nothing to do with . . . job performance, rather it is based on the position which we feel can be absorbed with the minimum impact on city services."  (*Id.*)  Nothing in the record suggests that Connolly's termination adversely affected her future employment prospects, and, as noted above, Bishop provided Connolly with a letter of recommendation lauding her work.

Although the Second Circuit has not expressly adopted the reorganization exception discussed above, courts in this circuit have implicitly subscribed to the reasoning that an employee who is laid off as a result of economic constraints need not be afforded the same process as one who is dismissed for cause.  *See Dwyer*, 777 F.2d at 833; *Perkowski v. Strafford Bd. of Ed.*, 455 F. Supp. 2d 91 (D. Conn. 2006); *Ritz v. Town of East Hartford*, 110 F. Supp. 2d 94, 102 (D. Conn. 2000) (suggesting that "legitimate

24

reorganization" would be a reason upon which to grant defendants' motion for summary judgment on the issue of a procedural due process violation of employee with protected property interest). Of course, the reorganization exception does not apply if an employee raises a genuine issue of material fact that her purported economic layoff was actually a pretext for some other impermissible reason for the termination. In such cases, due process would require a post-termination hearing to consider and investigate the employee's claim. *Dwyer*, 777 F.2d at 834 ("The nature of a claim of sham is such that a posttermination hearing will likely be more valuable to the claimant than a pretermination hearing.").

In *Dwyer*, a state employee whose job was eliminated due to budget constraints brought an action for wrongful termination, alleging that he should have been granted a pre-termination hearing and that his employer's claim of budget constraints was a sham. *Dwyer*, 777 F.2d at 828. Significantly, the plaintiff's complaint alleged that the state comptroller and his agents had "a personal dislike" for him and "formulated a plan to remove him from his position" for improper reasons. *Id.* at 827. The Second Circuit vacated the district court's dismissal of the claim and granted the plaintiff leave to amend his complaint, holding that

> [i]n the present case, it remains unclear whether a pretermination hearing was required, because [the plaintiff's] complaint does not clearly allege that he requested such a hearing. . . . Given the prior dearth of authority as to the existence and contours of a right to a pretermination hearing on a claim of sham, we conclude that [the plaintiff] should be given an opportunity to amend his complaint to allege, if such is the case, that he did in fact request a pretermination hearing into his claim that the announced elimination of his position was a sham.

25

*Id.* at 833.  The *Dwyer* court also recognized, however, that

> a state may well, from time to time, decide to make its operations more
> efficient by abolishing or consolidating positions or by implementing a
> considered reduction in its work force.  We are not persuaded that the state
> must routinely provide hearings for employees whose positions are targeted
> for elimination whenever the state adopts such efficiency measures.
> Where, however, as here, there is no indication that the state has undertaken
> substantial measures such as these but rather is alleged to have targeted a
> single employee for termination, we hold that if the state has a due process
> obligation to provide a hearing prior to removing that employee from his
> ongoing position, and if the employee protests the notice of elimination of
> this position and contends that it is but a sham and pretext for the
> deprivation of his property right, the state must be prepared to grant the
> employee some kind of hearing prior to the termination of his employment.

*Id.*

 "To reach a jury on a pretext claim, a plaintiff must present some evidence that

his termination was not for the reason specified by [defendants]."  *Taylor*, 161 Vt. at 469.

In other words, Connolly must point to evidence suggesting that Defendants' claim of

economic necessity was a pretext for some *other* impermissible reason for terminating

her.  *See Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 628 (2001) ("To defeat

employer's summary judgment motion, plaintiff has the burden of presenting some

evidence that [her] termination was not for the reason specified by [employer].").

Because Connolly bears the burden of proof at trial on the claim of a sham, to defeat

Defendants' Motion for Summary Judgment, she must make a showing sufficient to

establish the existence of her claim of a sham.  *See Parry*, 937 F. Supp. at 341; *Cifarelli*,

93 F.3d at 51-52 (holding, that to establish a claim of pretext under New York law, a

public employee whose position is abolished bears the burden of proving that the

employer's action was undertaken in bad faith).

Here, although, Connolly ostensibly argues that the City's claimed economic necessity was a pretext or a sham, Connolly raises no genuine issue of material fact to support a claim that her termination was *not* for lack of funds.  Unlike the facts at issue in *Dwyer*, Connolly does not allege that she was personally targeted for some improper reason.  To the contrary, each of Connolly's arguments and her supporting evidence *corroborate* that Defendants' reason for terminating her was purely economic and budget-related.  Connolly's sham argument is that Defendants' failure to include funding for her position in the budget was a "political" measure so that Mayor Louras could achieve the "goal of maintaining the tax rate," thereby giving taxpayers "needed and deserved relief."  (Doc. 50 at 4, 23.)  Connolly sets forth detailed evidence and analysis of the City's budget, which reveals that there was in fact a budget surplus for Fiscal Year 2010.  (Docs. 50 at 4-5; 50-2.)  Connolly also challenges Defendants' characterization of the City's property tax scheme as imposing a "cap" and points out that there is no tax cap, rather, if a tax rate exceeds a set amount ($0.85 per $100 of value), voters must directly approve the tax rate.[2]  (Doc. 50 at 4.)

None of this evidence raises a genuine issue of material fact with respect to Defendants' stated reason for Connolly's layoff.  Providing tax relief and maintaining a tax rate are legitimate economic concerns of municipal leadership.  A budget surplus for a particular year raises no genuine issue because, as Connolly points out in her Motion

---

[2] The Court notes that Connolly does not raise a pretext or sham argument arising out of the fact that Defendants hired two part-time employees shortly after she was terminated whose duties included many of Connolly's former duties.  *See, e.g.*, *Campana v. City of Greenfield*, 164 F. Supp. 2d 1078, 1093 (E.D. Wis. 2001) (citing cases providing that hiring a new employee to replace one who has been laid off is evidence of illegitimacy).

for Partial Summary Judgment, Mayor Louras "warned that, during [2009] the combination of planned salary increases and rising health care costs" would result in an increased tax rate in the *future.* (Doc. 47-1 at 6.) Similarly, Mayor Louras explained that his budget proposal was "not about 2009," but "about the future." (*Id.*)

It must be emphasized that Connolly raises no argument that Defendants terminated her for any impermissible non-economic reason. In fact, in Connolly's deposition, she conceded that she has no evidence to suggest that her termination was motivated by anything other than economic reasons. (Doc. 39-3 at 5.) All of Connolly's assertions support the conclusion that, in terminating her, the City was "undertak[ing] substantial measures" by "implementing a considered reduction in its work force" rather than targeting her specifically for termination. *Dwyer*, 777 F.2d at 833. Accordingly, a post-termination hearing would have served no purpose and was not required in this case.

A similar factual scenario arose in *Cifarelli v. Village of Babylon*, where an employee was terminated "on the grounds of economy and efficiency" but the employee alleged this was a pretext. *Cifarelli*, 93 F.3d at 51. In support of his pretext argument, the employee asserted that:

> (i) the proposed Village budget for the 1994-95 fiscal year allegedly showed no overall savings from the elimination of his position; (ii) the Village created three additional jobs which entailed certain code-enforcing functions formerly performed by [the employee]; and (iii) the Mayor['s] deposition testimony explained that his motivation for eliminating [the employee's] position was, in part, his desire to revamp the building operations department, to improve standards, and to proceed in another direction.

28

*Id.* (quotations omitted).  In concluding that these arguments failed to create a genuine issue of material fact, the Second Circuit noted that the plaintiff had "not alleged that his termination was the result of discrimination," and that the record demonstrated no lack of honesty on the part of the defendants.  *Id.* at 52.  The court also reasoned that the mayor's testimony that his "motivation for eliminating [the plaintiff's] position was a desire to 'revamp' the building operations department, to improve standards, and to 'proceed in another direction,' fully supports [defendants'] contention that the elimination of [the employee's] position was undertaken for efficiency purposes; such a motivation hardly evinces dishonesty or pretext."  *Id.*

        The same reasoning applies here.  Connolly has not presented evidence that Defendants have demonstrated a lack of honesty.  She sets forth no claim that her termination was based on discrimination.  As noted above, the record is replete with statements from Mayor Louras pertaining to concerns about the state of the City's financial health and the unwillingness of taxpayers to support a tax increase.  The mayor's concerns date back to a period substantially before his budget proposal failed to include funding for Connolly's position.  One exhibit provided by Connolly in support of her Motion is a copy of the minutes from the City's Board of Alderman meeting on June 2, 2008.  In that meeting, Mayor Louras stated that "there isn't much in the budget to cut except to cut bodies through attrition, layoffs or other means."  (Doc. 47-9 at 2.)  Mayor Louras also stated that "staff will need to be reduced at some point."  (*Id.*)  These statements reflect that the decision to eliminate Connolly's position was related to economic necessity, contemplated at least one year prior to when it occurred, and that

Connolly was on notice that her position could be affected.  Thus, no genuine issue of material fact exists regarding whether Defendants' termination of Connolly for purported economic reasons was a pretext, and the Court GRANTS Defendants' Joint Motion for Summary Judgment on Connolly's Section 1983 due process claim.

d.      First Amendment Retaliation

Connolly next argues that in retaliation for her filing of this lawsuit, Defendants failed to inform her that part-time employment with the City was available.  (Doc. 50 at 5.)  Defendants disagree, arguing that Connolly's lawsuit is not constitutionally-protected speech and that they were not required to provide her with special notice of available part-time work.  (Doc. 39-1 at 20.)

To establish a prima facie case of First Amendment retaliation, a plaintiff alleging that he was terminated must show (1) that his speech was constitutionally protected, (2) that he suffered an adverse employment decision, and (3) that a causal connection existed between his speech and the adverse employment determination against him.[3]  *Anemone v. Met. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011); *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008); *see Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). The public employee must also show that her right as a citizen in commenting upon matters of public concern outweighs the interest of her employer "in promoting the efficiency of the public services it performs through its employees."  *City of San Diego v.*

---

[3] Here, for the purposes of their Joint Motion for Summary Judgment, Defendants concede that a causal connection existed between Connolly's lawsuit and the adverse employment determination against her, if any.  (Doc. 39-1 at 20 n.3.)  Accordingly, the Court addresses only the first two elements.

*Roe*, 543 U.S. 77, 81 (2004) (quotation and citations omitted); *see also Mandell v. Cty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003).

      1.  Protected First Amendment Activity

      "Protected First Amendment activity" means speech made as a citizen on matters of public concern rather than as an employee on matters of personal interest. *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006); *see also Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Ruotolo*, 514 F.3d at 188. The same definition applies where the allegedly protected activity is the filing of a lawsuit. *Storman v. Klein*, 395 F. App'x 790, 793 (2d Cir. 2010); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 132 (D. Conn. 2010) ("It is well-established that the filing of a lawsuit . . . is constitutionally protected by the First Amendment."). "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Meyers*, 461 U.S. 138, 148 n.7 (1983).

      To determine whether Connolly's lawsuit constitutes protected First Amendment activity, the Court must first examine whether the lawsuit addresses a matter of public concern. In determining whether a public employee's speech addresses a matter of public concern, courts must consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48 (1983); *Ruotolo*, 514 F.3d at 189. The plaintiff's motivation for the speech is one factor the court may consider in determining whether the allegedly protected speech was on a matter of public concern, but this factor is not dispositive. *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009); *Brown v. City of Waterbury Bd. of Ed.*, 722 F. Supp. 2d 218, 230 (D. Conn. 2010). Speech by a public employee is on a matter of public concern if it relates "to any matter

of political, social, or other concern to the community."  *Connick*, 461 U.S. at 146; *see also Garcia v. State Univ. of N.Y. Health Sci. Ctr.*, 280 F.3d 98, 105 (2d Cir. 2001). Speech that is focused on matters personal to the employee cannot be classified as being on a matter of public concern.  *Connick*, 461 U.S. at 146; *see Schlesinger v. N.Y.C. Transit Auth.*, No. 00 Civ. 4759, 2001 WL 62868, at *5 (S.D.N.Y. Jan. 24, 2001) (holding that "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment falls outside the realm of constitutional protection") (quotation and citation omitted).  "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'"  *Ruotolo*, 514 F.3d at 189 (quotation omitted).

In this case, the Court finds that Connolly initiated this lawsuit as an employee on matters personal to her, and the lawsuit cannot be classified as being on a matter of public concern.  The content of the suit, as a whole, pertains to Connolly's termination, the procedures employed by the City to terminate her, and the City's alleged retaliation against her, individually.  The content of the alleged retaliation arises in the context of Connolly's lawsuit alleging wrongful termination, a context personal to her.  Although the form of the lawsuit consists of publicly-available documents and proceedings, Connolly's prayer for relief seeks relief only for herself and consists solely of remedies from which only she will benefit, such as reinstatement and compensatory and punitive damages.  (Doc. 26 at 13); *see Storman*, 395 F. App'x at 794.

In *Huth v. Haslan*, 598 F.3d 70, 75 (2d Cir. 2010), the Second Circuit found that a state employee's lawsuit arising out of her demotion following her reports about a co-

worker's conduct was not a matter of public concern.  The decision was based in part

upon the Second Circuit's reasoning that:

> Huth's original complaint, which she contends was protected speech and
> the basis for defendants' further retaliation, alleged only that defendants
> retaliated against her for specific statements she made to her supervisor and
> for the union activities of [another employee].  Much like other public
> employee speech that we have held not to be protected from retaliation by
> the First Amendment, Huth's lawsuit was personal in nature and generally
> related to her own situation.  Significantly, there is no suggestion in this
> record that Huth wanted to debate issues of discrimination, that her suit
> sought relief against pervasive or systemic misconduct by a public agency
> or public officials, or that her suit was part of an overall effort to correct
> allegedly unlawful practices or bring them to public attention.  Considering
> the record as a whole, we conclude that Huth's original complaint was not
> speech on a matter of public concern and, therefore, was not protected from
> retaliation by the First Amendment.

*Id.* at 74-75 (citations, quotations, and ellipses omitted); *see also Ezekwo v. N.Y.C. Health

& Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991); *Peterson v. City of Rochester*, No. 06-

CV-6003, 2010 WL 1408013, at *12 (W.D.N.Y. Mar. 31, 2010).

The same reasoning applies here.  Connolly argues that her lawsuit is protected

speech because its content "is of significant importance and interest to the citizens of

Rutland" and the lawsuit "concerns the means and methods by which the City's . . .

budget and property tax rates were adopted."  Connolly further asserts that the content of

the speech "concerns [Mayor Louras's] claim, made in the City's Annual Report . . . that

he had to eliminate funding for three full-time employees in order to achieve his political

goal of 'maintaining the tax rate.'"  (Doc. 50 at 25.)  Connolly's original Complaint,

however, raised claims arising out of Defendants' conduct in connection with her

termination.  Just as the plaintiff in *Huth*, the nature of Connolly's lawsuit is personal to

her and generally related to her own situation.  Likewise, there is no suggestion in her complaint that Connolly seeks to "debate issues of discrimination" or obtain "relief against pervasive or systemic misconduct by a public agency or public officials."  *Huth*, 598 F.3d at 74-75.  Nor is there any indication that this lawsuit is part of an overall effort to correct allegedly unlawful practices or bring them to public attention.

The Court acknowledges that "[d]iscussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern," *Harmon v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998), and "[m]atters of public concern . . . include speech aimed at uncovering wrongdoing or breaches of public trust," *Johnson v. Ganim*, 342 F.3d 105, 113 (2d Cir. 2003).  However, "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  *Ruotolo*, 514 F.3d at 190.  Connolly's lawsuit does not directly "concern" the City budget or claims made in its Annual Report. Her lawsuit was neither brought to "[d]iscuss[ ] . . . current government policies," *Harmon*, 140 F.3d at 118, nor "aimed at uncovering . . . breaches of public trust," *Ganim*, 342 F.3d at 113.  Connolly's only argument related to the City budget pertains to her claim that the City's "lack of funds" is a sham.  This argument constitutes a complaint about Connolly's "own dissatisfaction with the conditions of [her] employment."  *Sousa*, 578 F.3d at 174.  Accordingly, Connolly's lawsuit does not pertain to a matter of public concern.

2.   Adverse Employment Action

It is well-established that an employer's refusal to rehire a terminated employee is an adverse employment action sufficient to sustain a claim of retaliation. *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 283 (1977).  "[W]hether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination." *Zelnik*, 464 F.3d at 226 (citation omitted).

Here, Defendants hired two part-time employees shortly after Connolly was terminated.  However, as noted above, the Court concludes that Connolly's speech is not on a matter of public concern.  Where employee's speech is not on a matter of public concern, "no First Amendment claim arises, and that ends the matter." *Craccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008).  Thus, the Court need not address this issue further.

## II.        Qualified Immunity and Lack of Personal Involvement

Mayor Louras moves for summary judgment on all of Connolly's claims, arguing that he is entitled to qualified immunity.  (Doc. 43.)  In the alternative, Mayor Louras argues that the Court should grant his Motion with respect to Connolly's First Amendment retaliation claim because he lacked personal involvement in the alleged retaliatory conduct.  (Doc. 43-1 at 13.)

The Court concludes that Defendants are entitled to summary judgment for the reasons stated above.  Alternatively, Mayor Louras's Motion for Summary Judgment is granted on the basis of qualified immunity for the following reasons.

When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). "On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987). These conflicting concerns are accommodated by "providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.*; *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *Mitchell v. Forsyth,* 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions" they took). Thus, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.

In resolving government officials' qualified immunity claims, the Court must decide (1) whether the facts shown by the plaintiff make out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009). The Court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand." *Id.* at 818.  Rather than being "a mere defense to liability," qualified immunity is "an *immunity from suit*," which is "effectively lost if a case is erroneously permitted to go to trial." *Springfield Hosp. v. Hoffman*, No. 09-cv-00254-cr, 2010 WL 3322716, at *13 (D. Vt. Apr. 9, 2010) (quoting *Mitchell*, 472 U.S. at 526).

In this case, the first prong has already been addressed.  As set forth above, the Court found that Connolly did not allege facts sufficient to make out a violation of a constitutional right.  *See Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). Nevertheless, even assuming that Connolly has alleged facts sufficient to make out a violation of a constitutional right, Louras would still be entitled to qualified immunity because Connolly's rights under the First and Fourteenth Amendments were not "clearly established" at the time of Louras's alleged misconduct.

A right is clearly established if its "contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640.  In determining whether the official violated a clearly established right, the Court considers whether (1) the right was defined with reasonable clarity; (2) the Supreme Court or Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from existing law that his conduct was unlawful.  *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003).  "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Id.* (quotation omitted).

The operation of this standard, however, depends substantially upon the level of generality at which the relevant legal rule is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of clearly established law were to be applied at this level of generality, it would bear no relationship to the objective legal reasonableness that is the touchstone of *Harlow*. . . . [O]ur cases establish that the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Creighton*, 483 U.S. at 639-40 (quotations omitted).

Applying these principles to Connolly's due process claims, the Court concludes that Connolly did not have a clearly established right to a post-termination proceeding before the BCA. Although the Supreme Court and the Second Circuit have recognized that a public employee is entitled to some level of due process in conjunction with termination proceedings, these courts have not held that such rights necessarily extend to circumstances in which employees are laid off for economic or budget-related reasons unrelated to job performance. *See Dwyer*, 777 F.2d at 833; *cf. Whalen*, 397 F.3d at 25 ("[W]e have recognized a limited 'reorganization exception' to due process that eliminates the need for a hearing where a reorganization or other cost-cutting measure results in the dismissal of an employee."). A reasonable person in Louras's position could not have understood from existing law that eliminating funding for a position from

the City's budget without providing Connolly with a post-termination hearing constituted

unlawful conduct in violation of Connolly's constitutional rights.

Connolly's First Amendment right in relation to her retaliation claim is also not

clearly established.  As discussed above, it is not clearly established that, in filing the

lawsuit, Connolly engaged in any speech as a citizen on matters of public concern rather

than as an employee on matters of personal interest.  *Connick*, 461 U.S. at 146.  A

reasonable person in Louras's position could not have understood from existing law that

Connolly's lawsuit constituted protected activity under the First Amendment.

In short, any unlawful conduct on the part of Louras that resulted in a violation of

Connolly's constitutional rights was not apparent.  Accordingly, in the event a

constitutional violation occurred, Louras would be entitled to qualified immunity.

Because the Court concludes that Mayor Louras is entitled to qualified immunity, it need

not address whether Mayor Louras lacked personal involvement in the alleged retaliatory

conduct.

## III.    State Law Claims

Having concluded that Defendants are entitled to summary judgment on

Connolly's federal claims, the Court declines to retain supplemental jurisdiction over the

pendent state law claims.  *See* 28 U.S.C. 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*,

484 U.S. 343, 350 (1988) ("[I]n the usual case in which all federal-law claims are

eliminated before trial, the balance of factors . . . will point toward declining to exercise

jurisdiction over the remaining state-law claims."); *Matican v. City of New York*, 524

F.3d 151, 155 (2d Cir. 2008) ("[I]f [plaintiff] has no valid claim under § 1983 against any

defendant, it is within the district court's discretion to decline to exercise supplemental

jurisdiction over the pendent state-law claims.").

## Conclusion

The Court GRANTS Defendants' Joint Motion for Summary Judgment (Doc. 39).

The Court DENIES Connolly's Motion for Partial Summary Judgment (Doc. 47).

Connolly's state law claims are DISMISSED without prejudice.


Dated at Burlington, in the District of Vermont, this 24th day of August, 2011.


                                        /s/ John M. Conroy
                                        John M. Conroy
                                        United States Magistrate Judge